Our second case for this morning is Carson v. Lake County, Indiana And we will hear first from Mr. Rappa. Good morning. Good morning. May it please the court, my name is Michael Rappa and I represent Aaron Carson, the plaintiff appellant, as well as all the other plaintiff appellants in this matter. And we are here today on an appeal by the plaintiffs on a summary judgment that was granted in favor of Lake County on claims involving the Age Discrimination and Employment Act and also in terms of the 14th Amendment Equal Protection Clause. In this case, the plaintiffs, all of them, were age 65 and older. And with respect to this, most of them, not all of them, but most of them had worked for the county before. Was there anybody under the age of 65 that you are trying to compare these people to? Or are you just comparing the 65-year-olders who retired and then came back on a part-time basis with the 65 and older people who never retired and therefore continued to have Lake County's health insurance? I think in terms of the comparison, I don't know that there is actually a really good comparison that can be made. I think that there's, in trying to draw a comparison, I think it's really rare to find a situation where an employee has worked for an employer, has left, is receiving benefits as a result of that employment and has now returned back. So what do we do with the fact that when they came back, the Lake County people said, we're going to let you come back, but it's maybe employment at will with an underlining underneath it. We could let you go. And to make things simple, let's just assume they decide that the supplemental health they're offering over the Medicare is too expensive because they're in this very difficult financial position. So they let go all of these returned retirees. Do you have an age discrimination case there? I'm trying to take Medicare out of the picture. You know, they just, Lake County says, you know, with our regular part-time employees who are below the age of 65, we don't have to pay any health insurance at all. Those people are off doing whatever they do. But the retirees, we said, could have this supplemental plan, but it's become too expensive. So we're just going to let them go. Tell them we don't need you anymore. Is that age discrimination? Well, I don't think in that context it would be. Because it would be a matter, I think, in terms of, I think in a broader context, it would be a matter of perhaps a reduction in force because of financial considerations. If it's a matter of making a decision whether to take away that benefit and allow those folks to be employed, or just to eliminate them altogether, certainly they're at will. So the main theory that the magistrate judge had was that because there were actually these four factors that had to all add up before the person was going to be laid off, that meant that they couldn't show, as gross requires, that their age was a but-for cause. That there were all these other things. Medicare, you can't get the age out of Medicare. The federal statute causes people to be eligible for Medicare at a certain point in their life, and that's just an external fact. But there are lots of 65 and older people, apparently, who work for Lake County. Actually, I was surprised at the number. Ten percent of the workforce, they said. So tell me why, if age is even involved in one of the factors, you think there's an ADEA case, and tell me why that's consistent with the Supreme Court's decision in the Kentucky litigation. Well, with respect to that, if you look at the four bullet points that are in Mr. Dabberton's letter, in terms of the termination letter from August 21 of 2013, he's identifying that an individual has to meet all the following provisions and may not be employed and receive health insurance benefits. Has retired from, is over the age of 65, receives Medicare, and is currently insured through the supplementary coverage. With respect to that, what we've offered in our briefs, and you've seen that, is that we have shown from other circuits is that it is recognized that Medicare is a proxy for age in terms of 65. You can't separate the benefit from that or even the supplement from that. It's invoked at the moment that the person turns 65. They're Medicare eligible. They can certainly choose to take the Medicare. And, in fact, I think that certainly there are cases that recognize that an employer can request an employee to take the Medicare to reduce the benefits. Mr. Rappa, my confusion here is that I don't think this plan was a legitimate arrangement before or after the Affordable Care Act, where you've got current employees under this retiree health plan. With respect to the insurance policy for Aetna, the language for Aetna pre-Affordable Care Act, the language itself, and it's an exhibit in the record, is that you have to be retired to be part of the plan. Right. And federal law says, and not an employee. I think it's either no more than one or no more than two current employees in the plan. But Aetna was allowing that to happen. But if it's illegal, what's Lake County supposed to do? I don't know if that's illegal, but it's a matter of a breach of contract or maybe it's a matter of modifying the contract. What contract is breached? Well, in terms of the contract between Lake County and Aetna, in terms of the insurance policy coverage. Well, they may have enforcement problems with the federal government, but if they conclude that the benefit that they've been offering is illegal under federal law, before or after the Affordable Care Act, what are they supposed to do? Well, I think with regards to that, if they can make it so, as they attempted here, is to make sure that everyone within the plan is retired. That's what Mr. Grudzina says. But the problem with Mr. Grudzina is he's recommending that, look, in the future, go forward. Retired and not a current employee is the point, which means these folks can't stay on the plan and be employees. And he's recommending not to hire anybody who is retired as a rehire. Exactly. At least unless you're willing to pay their full health insurance and have the county's insurance primary to Medicare. I mean, if you want to pay, hire away. And the county is self-insured. We understand why the county didn't want to do that, but there was a route available to it. Let's suppose there's an incredibly valuable employee and the county is willing to really just keep that person on the payroll, pay what's necessary. Maybe it would do that. They could certainly put them on the plan in terms of what's feasible for the county. They're self-insured. They could put that person on the self-insured plan. Right, sure. So Mr. Grudzing is saying in order to comply with federal law, you can't be participating in this supplemental plan that has all sorts of other features to it that exist because it's for retirees if it's not a plan that has more than the permitted number of active workers in it. And I can't remember if it's one or two. It's less than two. Point five. And the import for what Mr. Grud was saying was, look, the plan, because it's all retirees, it achieves certain exemptions from HIPAA laws, for instance. Exactly. But they're not retirees. The fairly simplistic position that the law seems to take is you're not a retiree if you're actively working. Right. That doesn't seem discriminatory to me on the basis of age or anything. It's actually kind of a truism. The problem, though, is what to do with the folks that are already rehired. And I think what I would submit is that the Affordable Care Act — And the county reserved the right to tell them we're going to terminate your employment. So they're at-will employees. Right. Mr. Raffis, suppose the county had said, here's our problem. This arrangement is not lawful. We can't keep doing this. So each of you employees is going to have to choose. You're either going to have to drop the part-time work or you're going to have to drop the supplemental health insurance. But that's not what they did here. We know that. Suppose they offered that choice. Would that be more or less discriminatory or unlawful in your view? It would be less discriminatory because you're giving the person a choice. And I think that, prospectively, that's what they're doing. The problem is I would think your theory would reach that, that you can't give this group of 65-year-olds that unpleasant absence choice. Well, each person is different in terms of what they may want. Some people may want to have the supplements. Some people may think it's a great deal. Some people may not need it. Some people may need the wages more than anything else. Could I ask you briefly, is it correct that each of the plaintiffs was actually on the Aetna Medicare supplement plan? Yes. Okay. We were a little confused by some of the interrogatory answers in the record. But, okay, if they're all there, okay. All right. If you would like to save rebuttal time, you're free to do so. But you can keep talking if you want. All right. Mr. Overholt? Good morning. I'm Tony Overholt representing Lake County, Indiana. The termination decision in this case was not because of age. It was because of age. It was partly because of age, though, right? What do we do when age is one of several factors? I think that issue is best addressed by Kentucky retirement systems. And in our brief, we went through the six factors that the court looked at to determine how you address it in terms of a pension plan, or in this case, a benefit plan. And as we explained in our brief, by going through those six issues, we believe we did not discriminate based on age. And I can walk through those factors if you wish. And your basic point seems to be, you know, it was necessary but not sufficient to be 65 years old or more. And it's only the things that fill in that gap, both necessary and sufficient, that would bump into the ADEA. That's correct, and that's why we rely on Kentucky retirement systems. Mr. Overholt, before you go into those factors, could you explain to me what specific statute or regulation Aetna and the county were relying on and explain to me how this was ever a legitimate arrangement? I can't stand here today and address whether or not the underlying arrangement was proper or not. I simply know it existed. It came to the attention of the county in 2013 that there was a problem with it. And that was from Aetna? Yes, and Aetna raised it only after the Affordable Care Act's requirement in October 2013 was going to kick in. So what was new about the Affordable Care Act that hadn't been the case before under Medicare? What I understand is, or at least from the county's perspective, what I understood was that as of October 1, 2013, the Affordable Care Act was going to require that the county certify there was no less than two. No more than two. Sorry, I didn't say that. Less than two. Less than two. Less than two. Less than two. 35 if it was no less than two. Retirees who were on the plan and were working for the county. But that statutory language didn't change from before and after the Affordable Care Act. I understand, and that goes back to my point. Why this issue didn't come up before about the problem with the underlying plan, I don't know. I mean, it could be very simple. It could be that here's this giant new statute, everybody starts to do a good audit on all of their plans, and they think, oops, you know, we better get this in compliance too. Perhaps. I just don't know the answer to that. I just know it came to Aetna's attention and the county's attention then as they were doing an ACA review. It does seem to be bad PR for the ACA. A lot of people want to blame a lot of things on the ACA. But let me get at the question this way then, Mr. O'Rourke. Should we approach this on the assumption that Aetna and the county were wrong, but well-intentioned about the legal requirements? I don't think they were, but I just don't think that anything is new. But I'm confused. If you can't give us a more definitive answer about what you were trying to comply with. It's not a question of being wrong. It's a question of the county and Aetna were confronted with information in 2013 that told them they had to do something different. I don't think the court has to go back and reach the question of whether initially the plan was designed wrong. It may have been. It may not have been. The parties haven't addressed that. They haven't briefed it. The district court didn't address that issue. It's simply a fact that the plan existed in a certain form and a concern was raised about it. And I don't think this court need go beyond that in issuing an opinion. Why not give the employees a choice between keeping the job or the insurance? I was baffled by that, too. Here's why. There are two reasons. One is, again, when the county had this problem, they didn't know what to do. They went to an outside benefits lawyer. That's Mr. Grudzien, right? Yes, with expertise in this area. And Mr. Grudzien said, here's what you can do. I'm going to present you with two options. Those options are take those part-time employees and give them full-time insurance. That will address the issue. Or, I'm sorry, let me start that again. You make them full-time employees and give them full-time insurance, or you give them regular full-time insurance but keep them as part-time employees. Those were the only options presented. Why didn't he say, why don't you just treat them like your other part-time employees and don't give them any insurance? No supplemental, no nothing. Then Medicare, I presume, would be primary. You wouldn't have the problem of people participating in the retiree fund who were not retired. The record does not answer that question. I don't know why he didn't put that recommendation in, except I know I can answer the question from outside the record based on what I understand. What I understand is for these employees, they were generally paid a pretty low wage. And employees put much more weight on the benefit plan. That's what they really needed. Well, that would not be unique to this workplace, I'm sure. And I think no one would. But might not be universal. There may be some for whom. There may be. Who would have preferred to stay. There may. But I think the assumption that people were making at the time was no one would want to do that, that they wouldn't want to give that up. Now, again, I can't point to a record citation that says that. But that is my understanding. And that may be why Mr. Grusin, I don't know, presented it as here's your two options. And are all the plaintiffs, they were kept on the insurance plan, right? Yes. That's what they got. Because in essence, the county didn't know what else to do. I mean, that's the problem and one of the factors that's in Kentucky retirement systems. Is there some other way of dealing with the problem? And here, the county didn't know what else to do. Well, there's no other way of doing it unless you unwind the insurance arrangements. That seems certain. Whether you take them off, whether you fire them, whatever. You can't have this set of insurance arrangements. Correct. And these were the options. The two options that were presented are the options that the county felt it had. And it felt it made the decision that it would have let them go. Because it couldn't afford the other ones. And that's really what this case is. In a way, it's not really an age discrimination case at all. It's an insurance eligibility issue. Well, that's your primary argument for why what the county did didn't violate the age discrimination law. Yes. Even though age was a fact that was driving some things, it was something that was derivative of Medicare and how you structured your insurance plans. Correct. And, again, that's why we relied upon Kentucky health systems. Kentucky retirement, yeah. Unless the court has specific questions for me, I don't think I have anything further. Okay. Thank you very much. Anything further, Mr. Rapoport? Just briefly, I know that I was asked about Kentucky retirement systems and tried to draw a distinction about that. I think with regards to Kentucky retirement systems, there, there wasn't an individualized decision. It dealt with benefits, number one, but not with regards to termination. But the court in Kentucky retirement systems acknowledged that. They were looking at factors that had nothing to do with an individualized decision. And for that, they couldn't find it. What do you mean by individualized decision? I mean, it seems like this was a group that the county had, all of whom had to be treated the same way. That is to say, the people who took advantage of retirement, who came back, who were getting, you know, part-time, et cetera, who had certain external criteria. Well, with respect to that, I mean, individualized in this situation, there is an actual employment decision for each and every individual here. And through no fault of the plaintiffs, they find themselves out of a job. Oh, yeah, no, I don't think the plaintiffs did anything wrong. I mean, it's not a typical employment case where you can say, well, look, they're a poor performer. They're insubordinate or anything like that. They didn't even talk. The only thing that came up was in terms of contact with their immediate supervisors or department heads was a PowerPoint presentation to the department heads. There's nothing about it that dealt with performance. There's not even in terms of, all right, if we need to cut costs for a reason involving the county, that we would ask the department heads to make a decision who they want to have on. That's why I think that the problem is that there ultimately is a downfall for the folks that are fired. That's an individualized decision. And here, in terms of going back to Kentucky retirement systems, I mean, we look at, all right, a decision that is based on where it's direct evidence. And here, we're submitting that. I mean, the whole case is really just direct evidence. Does that Dabberton letter, does the PowerPoint evidence direct evidence of discrimination? Our argument is obviously that, yes, a reasonable jury could conclude that but for the fact they were 65, they'd still have their job. So what was the choice? What should the county have done? Well, they could have given the option as to whether they wanted to have the supplement or not. That would still be based on age 65, right? Right. The decision would still be based, and a different lawyer could still sue under that theory, right? You might buy it, but somebody else would say, look, you're presenting this unpleasant choice to these employees based upon their age. It would deal with the elimination of benefits as opposed to a termination of a position. One or the other. You've got to choose, right? Right. But what I would say is that with the ADEA, it's recognized that benefits can be reduced. And, in fact, they often are because of Medicare. The opposite of that, I mean, taking the logic of that, there's absolutely no way that someone who's been hired before and then comes back, there's no way they could possibly work for the county if they're over the age of 65. Do you have clients in this group who would have preferred to lose the insurance and stay on the job? Yes. How many? I can't say in terms of the number, but I know that some of them had significant financial issues. They needed that kind of income. I would point out that even with the people that had the early retirement offer, I think there were about five of them. Looking at that, and it's in the record, when you look at that, the obligation to provide the supplement was only for about five years. I want to give an example in terms of Dennis Tobin. The obligation for the county to provide him with a supplement, I think, ran out at the end of December of 2013 anyways. So, I mean, even after losing his position, there's no obligation under the early retirement plan, that offer that he agreed to several years ago, that there's no obligation for them to continue that on. They did continue it. They did continue it, but there's no obligation to do so. Okay. Thank you. Thank you very much, Mr. Rapa. Thanks to both counsel. We'll take the case under advisement.